IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 3, 2018

IN RE J'KHARI F.

Appeal from the Juvenile Court for Warren County
No. JV983     William M. Locke, Judge
_____

No. M2018-00708-COA-R3-PT
_____

This is a termination of parental rights case involving the parental rights of the mother, Alexis F. ("Mother"), to her minor child, J'Khari F. ("the Child"), who was five years old at the time of trial. On April 10, 2015, the Warren County Juvenile Court ("trial court") entered an order removing the Child from Mother's custody and placing the Child into the temporary legal custody of the Tennessee Department of Children's Services ("DCS"), effective April 9, 2015. The Child was immediately placed in foster care, where he remained at the time of trial. The trial court subsequently entered an order on September 24, 2015, finding that the Child was dependent and neglected due to Mother's insufficient housing, Mother's insufficient means to support the Child, and the Child's positive drug test result for methamphetamine. On April 18, 2017, DCS filed a petition to terminate the parental rights of Mother.[1] Following a bench trial, the trial court terminated Mother's parental rights to the Child upon determining by clear and convincing evidence that (1) Mother had abandoned the Child by willfully failing to support him, (2) Mother had abandoned the Child by willfully failing to visit him, (3) Mother had abandoned the Child by engaging in conduct prior to her incarceration that exhibited wanton disregard for the Child's welfare, (4) Mother had not substantially complied with the reasonable requirements of the permanency plans, (5) the conditions leading to the Child's removal from Mother's custody persisted, and (6) Mother had failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Child. The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Mother has appealed. Upon a determination that the evidence presented at trial did not support a finding by clear and convincing evidence that Mother had abandoned the Child by willfully failing to support him during the four months prior to her incarceration, we

_____
[1] In its petition, DCS also sought to terminate the biological father's parental rights. Prior to the trial in this matter, the father surrendered his parental rights to the Child. The father is not participating in this appeal; therefore, we will confine our analysis to those facts relevant to Mother.

reverse as to that statutory ground. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Christina S. Stanford, McMinnville, Tennessee, for the appellant, Alexis F.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

At the commencement of the dependency and neglect action, Mother was a minor. On April 10, 2015, the trial court entered an order removing Mother from the custody of her mother ("Grandmother") and the Child from Mother's custody, effective April 9, 2015. Both Mother and the Child were placed in foster care. Mother attained eighteen years of age prior to the adjudicatory hearing, thereby aging out of DCS custody.[2] In the adjudicatory and dispositional hearing order entered on September 24, 2015, the trial court determined that the Child was dependent and neglected based upon the following factual findings: "[Mother] does not have a place for the child to stay, does not have a means to support the child, and cannot take care of the child at this time. [The Child] tested positive for methamphetamine." The trial court further found that it was in the Child's best interest to remain in the custody of DCS. While the Child continued in DCS custody, DCS developed six permanency plans, each of which was approved by the trial court as containing requirements that were reasonably related to remedying conditions necessitating foster care and that were in the best interest of the Child.

From October 6, 2016, through October 10, 2016, Mother was incarcerated for "failure to appear and for an attachment for child support." Mother was subsequently arrested on April 8, 2017, due to her "failure to appear on fines and costs and failure to appear for child support." Mother remained incarcerated until April 11, 2017.

_____

[2] The record reflects that for a period of time, Mother utilized an extension of foster care services until terminating those services in September or October 2017 to seek employment.

On April 18, 2017, DCS filed a petition to terminate Mother's parental rights to the Child, alleging the following statutory grounds: (1) abandonment by willful failure to support the Child, (2) abandonment by willful failure to visit the Child, (3) abandonment by engaging in conduct prior to Mother's incarceration that exhibited her wanton disregard for the Child's welfare, (4) substantial noncompliance with the reasonable requirements of the permanency plans, (5) persistence of the conditions leading to the Child's removal from Mother's custody, and (6) failure to manifest an ability and willingness to personally assume custody of or financial responsibility for the Child. DCS also averred that termination of Mother's parental rights was in the best interest of the Child.

During a bench trial conducted on March 5, 2018, the trial court considered testimony from four witnesses, including Mother, the Child's DCS family service worker, the foster mother, and Grandmother, as well as several exhibits presented by DCS. On March 26, 2018, the trial court entered an order terminating Mother's parental rights to the Child and finding by clear and convincing evidence that (1) Mother had abandoned the Child by willfully failing to support him, (2) Mother had abandoned the Child by willfully failing to visit him, (3) Mother had abandoned the Child by engaging in conduct prior to her incarceration that exhibited wanton disregard for the Child's welfare, (4) Mother had not substantially complied with the reasonable requirements of the permanency plans, (5) the conditions leading to the Child's removal from Mother's custody persisted, (6) Mother had failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Child, and (7) termination of Mother's parental rights was in the best interest of the Child. Mother timely appealed.

## II. Issues Presented

Mother has presented eight issues for our review, which we have restated slightly as follows:

1. Whether the trial court erred by finding clear and convincing evidence that Mother had abandoned the Child by willfully failing to financially support him for four months preceding Mother's incarceration.

2. Whether the trial court erred by finding clear and convincing evidence that Mother had abandoned the Child by willfully failing to visit him for four months preceding Mother's incarceration.

3. Whether the trial court erred by finding clear and convincing evidence that Mother had abandoned the Child by her conduct

exhibiting wanton disregard for the Child's welfare prior to Mother's incarceration.

4.  Whether the trial court erred by finding clear and convincing that Mother had not substantially complied with the reasonable requirements of the permanency plans.

5.  Whether the trial court erred by finding clear and convincing evidence that the conditions leading to the Child's removal from Mother's custody persisted and that other conditions persisted that would in all probability cause the Child to be subjected to further abuse or neglect.

6.  Whether the trial court erred by finding clear and convincing evidence that Mother had failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Child.

7.  Whether the trial court erred by finding clear and convincing evidence that DCS had provided reasonable efforts to assist Mother with the requirements included in the permanency plans.

8.  Whether the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

- 4 -

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> * * *
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of six statutory grounds to terminate Mother's parental rights:  (1) abandonment by willful failure to support the Child, (2) abandonment by willful failure to visit the Child, (3) abandonment through conduct exhibiting wanton disregard for the Child's welfare prior to Mother's incarceration, (4) substantial noncompliance with the permanency plans, (5) persistence of conditions leading to the removal of the Child, and (6) failure to manifest an ability and willingness to assume custody of or financial responsibility for the Child.  We will address each statutory ground in turn.

### A. Statutory Abandonment by an Incarcerated Parent

The trial court terminated Mother's parental rights based on statutory grounds that she had abandoned the Child.  Tennessee Code Annotated § 36-1-113(g)(1) provides in relevant part:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

    (1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

In the case at bar, it is undisputed that Mother had been incarcerated for a portion of the four months prior to the petition's filing. Mother was arrested on April 8, 2017, for "failure to appear on fines and costs and failure to appear for child support" and remained incarcerated until April 11, 2017. Because Mother had been incarcerated within the four months prior to the filing of the petition to terminate her parental rights, the definition of abandonment contained within Tennessee Code Annotated § 36-1-102(1)(A)(iv) (2017) applies.[3] This subdivision provides in pertinent part:

    (iv)     A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .

    1.  Abandonment by Willful Failure to Support or Visit the Child

---

[3] Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 36-1-102(A) to substitute the phrase, "proceeding, pleading, petition, or any amended petition," in place of "proceeding or pleading." *See* 2018 Tenn. Pub. Acts, Ch. 875, § 1 (H.B. 1856). Pursuant to the same amendment, the words, "willful" and "willfully," have been deleted wherever they previously appeared in in subsection -102(1), and a new subsection, -102(1)(I), has been added, providing that the "absence of willfulness" shall be an affirmative defense to abandonment for failure to visit or support, for which "[t]he parent or guardian shall bear the burden of proof." *See id.* at § 2. Inasmuch as the instant action was filed in April 2017, we will confine our analysis in this Opinion to the version of Tennessee Code Annotated § 36-1-102 in effect at that time.

Mother argues that the evidence before the trial court did not support a finding by clear and convincing evidence that she willfully failed to financially support the Child or that she willfully failed to visit the Child. Both abandonment by failing to support and abandonment by failing to visit, pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv) require, the court to analyze the four months prior to Mother's incarceration to determine whether Mother willfully failed to visit or support the Child during that time. In this case, the determinative period began four months immediately preceding Mother's arrest on April 8, 2017. The relevant four-month period therefore spanned December 8, 2016, through April 7, 2017. *See In re D.H.B.,* No. E2014-00063-COA-R3-PT, 2015 WL 1870303, at *8 (Tenn. Ct. App. Apr. 23, 2015) (interpreting the four-month period "immediately preceding" the parent's incarceration as ending on the day before the actual date of incarceration).

Also, pursuant to the applicable version of the statute, the trial court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court previously has explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. section 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

Failure to visit or support a child is willful when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. This Court has further explained:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.*

### a. Willful Failure to Visit

First, we will address the ground of abandonment by willful failure to visit. Mother essentially argues that the trial court erred by finding that Mother's failure to visit was willful. DCS, however, argues that Mother's failure to visit was willful and that her

failure to request reinstatement of her visitation does not preclude a finding that her failure to visit was willful. Upon a thorough review of the record, we agree with DCS on this issue.

"A parent cannot be said to have abandoned a child when his failure to visit . . . is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). A parent's failure to visit is not excused by someone else's conduct unless the conduct actually prevents the obligated person from visiting or "amounts to a significant restraint of or interference with the parent's efforts to develop a relationship with a child." *Id.* at 863-64. Lastly, any efforts made to visit a child after a petition to terminate parental rights has been filed do not negate or provide repentance for prior abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(F); *In re S.R.M.*, E2008-01359-COA-R3-PT, 2009 WL 837715, at *12 (Tenn. Ct. App. Mar. 27, 2009).

In the case at bar, Mother had not visited the Child at the time of trial since August 22, 2016. Mother does not dispute that she failed to visit the Child during the four months prior to her incarceration. Instead, Mother contends that her failure to visit was not willful because the trial court had suspended her visitation, she was unaware that she could reinstate her visitation by presenting herself to the trial court, and she was unable to procure an alternative location or supervisor for her visits.

On December 12, 2016, Mother failed to appear for a permanency hearing. During that hearing, the trial court found that Mother had failed to complete any of the requirements on her permanency plan since the previous court date. The court suspended Mother's visitation with the Child. Although Mother was absent, Mother's attorney was present during the hearing when Mother's visitation was suspended. Mother's attorney was also included in the certificate of service on the court order reflecting the December 12, 2016 hearing, wherein the trial court specifically directed that Mother would have no visitation "until she present[ed] herself" to the court.

Our Supreme Court has held that a prior order suspending a parent's visitation does not necessarily preclude a finding that the parent willfully failed to visit the child. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013). In *In re Adoption of Angela E.*, the parent's visitation had been suspended by the trial court for approximately three years. *Id.* During that time, the parent had filed a petition to reinstate visitation but had taken no further action to pursue the matter for two years. *Id.* The Supreme Court recognized that the parent had made no attempt to see his children until after the termination petition was filed and had provided no reasonable excuse for not pursuing his petition. *Id.* As such, the Court concluded that the parent was not "actively trying to maintain visitation." *Id.* Consequently, the Court held that "the prior order suspending Father's visitation rights did not preclude a finding that Father willfully failed to visit the

children." *Id.* In this case, we note that Mother had not filed a motion to reinstate her visitation and had not "present[ed] herself" to the trial court as the order had instructed. Because the order suspending Mother's visitation does not preclude a finding of willfulness, Mother is not entitled to relief based on this prior order.

Mother also argues that her failure to visit was not willful because she was unable to secure a supervisor or location for her visits. According to Mother's appellate brief, "she did not choose to quit visiting her child but did not have the means to continue doing so, per the supervisor's demands." An affidavit of reasonable efforts, prepared and notarized by the Child's DCS family service worker, Jimmie Lynn Wolfe, was entered as an exhibit at trial without objection. The affidavit reflects, *inter alia*, that DCS had provided Mother with fifteen hours of therapeutic visitation per month "due to needing hands-on parenting education, training in managing illnesses and injuries at home, . . . First Aid Training, and [her] need[] to learn age-appropriate discipline." The affidavit also reflects that fifteen hours of visitation had been approved monthly from April 2016 through September 2016. According to Mother's testimony, her aunt had previously supervised the visits, but "something had went on with her supervising [Mother's] visits." Mother testified that the current supervisor for her visits had informed Mother that she would need to secure an alternate location for visits or acquire a different supervisor. Mother stated that she did not have another place for the visits to take place or a different supervisor to supervise her visits.

It is undisputed that Mother was aware of her duty to visit the Child. Mother was provided with a copy of the Criteria and Procedures for Termination of Parental Rights on May 5, 2015, and November 2, 2015, as evinced by her signature on the respective forms. The documentation also demonstrates that Ms. Wolfe had explained the contents of the forms to Mother on May 5, 2015, and November 2, 2015. According to Ms. Wolfe, the trial court similarly explained to Mother on June 29, 2015; December 21, 2015; June 20, 2016; April 10, 2017; and April 24, 2017, that her failure to visit the Child could result in the termination of her parental rights. The respective court orders for those dates support Ms. Wolfe's testimony that Mother was present during those hearings and that the trial court had explained to Mother that her failure to visit the Child could result in the termination of her parental rights.

Mother's final visit with the Child was on August 22, 2016. We note that Mother had not visited the Child for approximately three months prior to the suspension of her visitation rights by the trial court on December 12, 2016. In its review order, entered September 28, 2016, the trial court found as follows regarding Mother's visitation:

> [Mother] gets 15 hours a month of therapeutic visits. She visited the child on July 9, 2016, July 16, 2016, and July 19, 2016. [Mother] cancelled her visit on July 22, 2016. A 5 hour visit was scheduled for August 22, 2016.

[Mother] was late for the visit and the visit had to change locations. She only visited for one hour that day. [Mother] has not scheduled any visits since that time. [Mother] did not attend a tentatively scheduled visit after August 22, 2016.

According to Mother's appellate brief, "Mother's understanding of the reason behind the termination of her visits was that the in-home services provider that supervised the visits was dissatisfied with the location in which the visits occurred." Mother claims that she was unable to secure an alternate location or supervisor for the visits. In its order, the trial court does not express a specific reason for suspending Mother's visitation. However, the trial court found in that order that Mother had been served with notice and failed to appear at the hearing and that she had failed to complete any of the requirements on her permanency plans.

Mother testified that she contacted Ms. Wolfe but that the two were unable to identify a supervisor for the visits. According to Mother, she also attended a mental health assessment with Scott Herman, which she stated was intended to assist her with obtaining unsupervised visitation. However, Mr. Herman opined that Mother had been dishonest during the assessment and was required to repeat it. Mother responded that she subsequently attended an appointment with Mr. Herman. Notwithstanding, Ms. Wolfe testified that Mother never completed the second assessment. The trial court determined that Mother never successfully completed the mental health assessment with Mr. Herman. Mother presented no additional evidence regarding her attempts to visit the Child or obtain a new supervisor for her visits.

Following the suspension of her parental visits, Mother moved to Arkansas in January 2017 and resided with her paramour. At some point, Mother returned to Tennessee and was subsequently arrested on April 8, 2017. Mother did not appear before the trial court until April 10, 2017, for a review and permanency plan ratification hearing while she was incarcerated. Ms. Wolfe related that Mother had not contacted her to request scheduling a visit with the Child and that despite Mother's knowledge regarding how to so schedule, Mother had failed to make an attempt to visit the Child during the four months prior to her incarceration. Mother's visitation with the Child was suspended but only until Mother "presented herself to" the trial court. Between the hearing conducted December 12, 2016, and the termination petition's filing on April 18, 2017, Mother did not file a motion to reinstate her visitation or otherwise request that the trial court allow her to visit with the Child. Mother did appear in court on April 10, 2017, but was incarcerated at the time. No motion for visitation was pending, and the record does not reflect that Mother requested that her visitation be reinstated during that hearing.

The trial court accordingly found that Mother was aware of her duty to visit the Child, knew the child was in foster care and how to schedule visits, had made no attempt

to visit the Child prior to her incarceration, and presented no justifiable excuse for failing to visit the Child. Based upon those findings, the trial court determined that Mother's failure to visit the Child was willful. Upon a thorough review of the record, we determine that the evidence proffered does not preponderate against the trial court's finding by clear and convincing evidence that Mother's failure to visit was willful. Therefore, we affirm the trial court's termination of Mother's parental rights based on this statutory ground.

### b. Willful Failure to Support

The trial court also found clear and convincing evidence that Mother had abandoned the Child by willfully failing to financially support him during the four months prior to Mother's incarceration. Mother contends on appeal that DCS failed to prove by clear and convincing evidence that Mother's failure to support the Child was willful. According to Mother, there is not sufficient evidence in the record to prove that Mother had an ability to pay child support during the relevant four months. Upon careful review, we determine that DCS failed to prove by clear and convincing evidence that Mother abandoned the Child by willfully failing to support him during the entire four months prior to her incarceration.

Mother's argument focuses on the element of willfulness and her ability to pay support. According to Mother, "there was no proof as to what her actual bills were nor their individual amounts" and "[w]ithout this information, the trial court cannot properly determine if a parent had the ability to pay any amount of financial support." Mother thereby argues that the evidence in the record is insufficient to prove that she had an ability to pay child support during the relevant time period.

DCS contends that the absence of evidence regarding the parent's expenses and income is not fatal to the ground of abandonment by willful failure to financially support so long as other evidence in the record establishes by clear and convincing evidence that the parent had the ability to pay support during the relevant statutory time period. *See, e.g., In re P. G.*, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *12 (Tenn. Ct. App. Aug. 17, 2018) (citing *In re Addalyne S.*, 556 S.W.3d 774, 791 (Tenn. Ct. App. 2018)). According to DCS, "Mother's boyfriend paid the bills, her family members sometimes wired her money, and she explicitly admitted at trial that from January to April 2017, she had enough money to pay child support." Based on the foregoing, DCS argues that this ground should be affirmed.

During trial, DCS presented evidence to support its assertion that Mother had not paid support from January 7, 2017, through April 7, 2017. Ms. Wolfe, the Child's DCS family service worker, while not specifying a time period, testified that Mother had not been paying support. Ms. Wolfe also mentioned that Mother had appeared in court for

failure to pay child support. However, the record does not include any court orders regarding those child support proceedings or any record from the Department of Human Services reflecting Mother's child support payments or lack thereof. *See* Tenn. Code Ann. § 24-7-121(a)(1) ("The department of human services child support payment records shall be the official records for all payments which have been appropriately sent to the central collection and distribution unit pursuant to § 36-5-116."). Although Ms. Wolfe testified that Mother was $1,500 behind on child support, she again made no reference to the time period within which the arrearage accrued.

According to Mother's testimony, family members had sent money to her while she resided in Arkansas. Furthermore, her paramour, with whom she was residing, had also paid living expenses. Mother explained that she had sufficient money to pay her bills but that she "wasn't able to pay in on the child support" from January 7, 2017, through April 7, 2017. Mother explained that she had attempted to send cash but was unaware that she had to use a money order.[4] According to Mother, she had enough funds available from January 7, 2017, through April 7, 2017, that she could have paid something toward her child support. Nonetheless, Mother acknowledged that she had not paid any child support while she was out of state and that she had moved to Arkansas in January 2017. We note, however, that the determinative period actually began one month before Mother relocated.

Establishment of this statutory ground is complicated by the parties' consistent misstatement of the relevant statutory period throughout the record. Although Mother asserts on appeal that the proper determinative period extends from January 7, 2017, to April 7, 2017, DCS correctly identifies the determinative period as extending from December 8, 2016, through April 7, 2017. The evidence presented by DCS at trial, however, focused on the time period from January 7, 2017, to April 7, 2017. DCS failed to address the month spanning from December 8, 2016, through January 6, 2017, for which the record is completely devoid of evidence regarding whether Mother paid support or had the ability to pay support. Ergo, we cannot determine whether Mother willfully failed to financially support the Child during the entire statutory four-month period. *See In re Ashton B.*, No. W2015-01864-COA-R3-PT, 2016 WL 981320, at *15 (Tenn. Ct. App. Mar. 15, 2016) ("[T]he Tennessee General Assembly has clearly directed this Court to consider not just the time immediately preceding the filing of a termination petition, but the entire four months prior to its filing.").

In its written judgment, the trial court did not identify the relevant four-month period but determined that Mother had willfully failed to support the Child for four months prior to her incarceration. In its oral ruling, the trial court stated that "from

---

[4] Other than Mother's testimony, the record does not address whether Mother was required to pay her child support by money order or whether other options were available to her.

January 7 to April 7," Mother had the ability to pay financial support for the Child but did not pay such support and that Mother maintained an arrearage "with the Child Support Office." This Court has previously held that a trial court's utilization of the incorrect determinative period when considering grounds of abandonment requires the appellate court to vacate the trial court's judgment on that ground and remand for findings regarding that issue. *See In re Travis H.*, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at \*9 (Tenn. Ct. App. May 5, 2017), *perm. app. denied* (Tenn. July 31, 2017); *In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at \*14 (Tenn. Ct. App. Oct. 21, 2015). However, this Court has also determined that a miscalculation of the relevant four-month period can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period. *See, e.g.*, *In re Savanna C.*, No. E2016-01703-COA-R3-PT, 2017 WL 3833710, at \*9 (Tenn. Ct. App. Apr. 18, 2017); *In re Selena L.*, No. E2015-02059-COA-R3-PT, 2016 WL 4056185, at \*10 (Tenn. Ct. App. July 27, 2016).[5]

In this case, no evidence was presented to the trial court demonstrating that Mother had failed to financially support the Child or that she had the ability to pay support from December 8, 2016, through January 6, 2017. Having determined that the proof is insufficient to support a finding by clear and convincing evidence that Mother willfully failed to support the Child during the entire determinative period, we reverse the trial court's finding on this statutory ground.

## 2. Abandonment Through Wanton Disregard

Mother contends that the trial court erred by finding the existence of clear and convincing evidence that Mother had abandoned the Child through her actions prior to incarceration, thereby exhibiting wanton disregard for welfare of the Child. Concerning this ground, Tennessee Code Annotated § 36-1-102(1)(A)(iv) provides in pertinent part:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

---

[5] We note that although the parties incorrectly identified the relevant four-month period, the evidence presented regarding abandonment by Mother's failure to visit encompassed the entire period. The trial court did not identify the relevant period but found that Mother had willfully failed to visit for four months immediately prior to her incarceration. The trial court also found that Mother had not visited the child since August 2016, which also encompassed the entire relevant four-month period. No such evidence was presented regarding Mother's failure to support during the first month of the determinative period.

(Emphasis added.)

A parent's actions constituting wanton disregard for the welfare of a child are not restricted to solely the four-month period prior to incarceration. *See In re Audrey S.,* 182 S.W.3d at 871. This Court has consistently held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d at 867-68; *see also In re K.F.R.T.,* No. E2015-01459-COA-R3-PT, 2016 WL 908926, at *4 (Tenn. Ct. App. Mar. 10, 2016). "Simply stated, a parent's 'poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children.'" *In re T.L.G.*, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at *3 (Tenn. Ct. App. May 26, 2015) (quoting *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009)).

In the instant action, the trial court determined by clear and convincing evidence that Mother's conduct prior to her incarceration had exhibited wanton disregard for the Child's welfare. The trial court specifically found that Mother had been "in and out of jail," having been incarcerated in October 2016 for "failure to appear and for an attachment for child support" and in April 2017 for "failure to appear on fines and costs and failure to appear for child support." In its order, the trial court concluded that Mother never provided stable housing or an appropriate environment for the Child and that Mother had failed to pay child support. According to the trial court, Mother also had been a victim of domestic violence and had not initiated measures to address the situation.[6] Additionally, the trial court found that Mother had not completed her recommended alcohol and drug treatment and continued to relapse throughout the time the Child remained in DCS custody. The trial court further found that Mother had not successfully completed a mental health assessment, as required by the permanency plans. The trial court explained that Mother had not complied or followed up with the mental health assessment and had failed to make appointments with the psychological examiner. The evidence adduced at trial supports these findings.

Mother testified that she had remained drug free for approximately eight days prior to trial. However, Mother acknowledged that she had continued to use methamphetamine and marijuana regularly since the Child had been in DCS custody and admitted to using methamphetamine and marijuana as recently as two weeks prior to trial. The trial court also found that Mother had suffered relapses throughout the time the Child was in DCS custody. During the pendency of the case, Mother failed to complete her

---

[6] The record reflects domestic abuse allegations concerning Mother and the biological father of her second child born during the pendency of the dependency and neglect action.

alcohol and drug assessment or seek treatment for her addiction. Shortly after the Child was placed into DCS custody, the Child tested positive for methamphetamine. In July 2016, Mother gave birth to a second child. Subsequently, Mother and the newborn both tested positive for amphetamine.[7] Mother reportedly lost custody of that child through proceedings in the state of Kentucky.

We conclude that the evidence regarding Mother's conduct prior to her incarceration, including her use of illegal drugs and her failure to pay child support for the Child, supports the trial court's determination that the statutory ground of abandonment through wanton disregard was proven by clear and convincing evidence. We therefore affirm the trial court's reliance on this statutory ground for termination. The trial court did not err in finding clear and convince evidence of abandonment through Mother's willful failure to visit the Child and her conduct prior to incarceration that exhibited wanton disregard for the welfare of the Child.

### B. Substantial Noncompliance with the Permanency Plans

Mother also contends that the trial court erred by finding clear and convincing evidence that she failed to substantially comply with the reasonable responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as a ground for termination of parental rights:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

At the outset, Mother relies on case law prior to our Supreme Court's opinion in *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Mother states in her appellate brief that "[r]esponsibility is also placed on [DCS], which must use reasonable efforts to also comply with the statement of responsibilities assigned to it in the permanency plan." Mother thereby argues that DCS failed to make reasonable efforts to assist Mother with the requirements on her permanency plans, warranting reversal of this statutory ground. We note that in *In re Kaliyah S.*, our Supreme Court held that "in a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *Id.* Additionally, this Court has previously explained: "The termination statute regarding the ground of substantial

---

[7] In its judgment, the trial court found that Mother and her second child tested positive for methamphetamine during a drug screen. However, the record indicates that Mother and the child actually tested positive for amphetamine following the birth.

- 16 -

noncompliance with the requirements of a permanency plan contains no requirement that DCS expend reasonable efforts to assist a parent in complying with the permanency plan requirements." *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at \*7 (Tenn. Ct. App. June 21, 2017) (citing Tenn. Code Ann. § 36-1-113(g)(2)). Because DCS was not required to provide reasonable efforts in order to prove this ground, we will address Mother's issue regarding reasonable efforts in the best interest analysis.

In the case at bar, DCS developed six permanency plans involving Mother and the Child. The first plan was developed on May 5, 2015; ratified by the trial court on June 29, 2015; and presented as an exhibit during the termination trial. Mother participated in the development of this permanency plan. As to Mother, this plan set forth the following responsibilities, which were approved by the trial court as reasonably related to remedying the conditions that necessitated foster care: (1) Mother would successfully complete parenting classes and provide proof of completion to DCS; (2) Mother would openly and honestly complete an alcohol and drug consultation and follow all recommendations therefrom; (3) Mother would not use or abuse illegal or prescription drugs; (4) Mother would submit to random and scheduled drug screens to verify her sobriety; (5) Mother would not chemically alter her hair;[8] (6) the Child would have safe, secure, and stable housing with working utilities and a supply of food; (7) Mother would not allow any known drug users in the home or around the Child; (8) Mother would be emotionally stable; (9) Mother would openly and honestly participate in a mental health assessment and follow all resultant recommendations; (10) Mother would participate in individual counseling and domestic violence counseling; and (11) Mother would sign releases to allow DCS to obtain information from service providers.[9]

The second permanency plan was developed during a child and family team meeting on November 2, 2015, and was approved by the trial court on December 21, 2015. Mother also participated in the development of this permanency plan. The plan echoed Mother's responsibilities from the first permanency plan and included the following additional action steps for Mother to complete: Mother would (1) provide proof of her income, (2) resolve all legal issues, (3) follow the rules of her probation, and (4) remain in contact with DCS. This plan also required that Mother not serve as the supervisor for any visits between Grandmother and the Child. The trial court found the second permanency plan requirements to be reasonably related to remedying the conditions necessitating foster care.

---

[8] The record does not reflect the reasoning behind the requirement that Mother not chemically alter her hair. Mother has not raised an issue regarding the reasonableness of any individual requirements.

[9] The initial permanency plan contained requirements specific to Mother's treatment plan while in DCS custody, but those requirements were removed from subsequent plans after Mother reached eighteen years of age.

The third permanency plan, which was developed on March 31, 2016, and ratified by the trial court on June 20, 2016, repeated the same requirements as the previous plans, except for the DCS custodial treatment requirements for Mother, but provided that Mother "re-do" her mental health assessment due to the evaluation indicating that Mother had been untruthful. The order ratifying the third plan reflects that Mother participated in and was in agreement with this permanency plan. In its order, the trial court found the requirements contained in the third permanency plan to be reasonably related to remedying the conditions necessitating foster care. The trial court entered an order memorializing a review hearing, which occurred on September 26, 2016. The court relieved DCS from making reasonable efforts for Mother unless she submitted herself to the trial court and requested that reasonable efforts be made to assist her. According to Ms. Wolfe, however, DCS continued to make reasonable efforts to assist Mother following entry of that order. The fourth permanency plan, developed on September 6, 2016, and ratified by the trial court on October 24, 2016, included the same responsibilities for Mother as in the previous plans.

DCS subsequently developed two additional permanency plans on March 1, 2017, and August 31, 2017, which were respectively approved by the trial court on April 10, 2017, and October 30, 2017. By these plans, DCS removed the goal of returning the Child to Mother and included a sole goal of adoption. DCS also removed all requirements for Mother to complete.

Aside from Mother's argument regarding DCS's efforts to assist her, Mother posits that she had "made definite improvements in her situation in efforts to regain custody of [the Child]," including providing evidence of a lease, presenting "documentation from Generations for treatment," completing an alcohol and drug assessment, completing domestic violence classes, beginning parenting classes, passing drug screens for DCS, and participating in a psychological evaluation.[10]

On appeal, Mother does not further explain her actions of providing "documentation from Generations for treatment." However, a court order from a hearing on February 8, 2016, stated that Mother had provided a letter from Generations "welcoming [her] to the team." Additionally, Mother testified at trial that she was making progress toward gaining employment but that she needed to go to Generations. She also offered that she had "almost a guaranteed job" but did not wish to identify it until she had paperwork to support same.

Ms. Wolfe testified that although Mother had participated in a mental health assessment with Scott Herman, Mr. Herman opined that Mother was being dishonest during the assessment. According to Ms. Wolfe, she assisted Mother with scheduling

---

[10] In her appellate brief, Mother identifies Generations as a "local treatment facility."

another mental health assessment, but Mother did not complete the second assessment. Regarding noncompliance, Ms. Wolfe testified that Mother had cancelled an appointment with Mr. Herman on June 22, 2015, for "a pre-cert for psychological evaluation"; cancelled an appointment for a psychological evaluation on July 27, 2015; missed a re-testing appointment with Mr. Herman on August 26, 2016; and missed appointments with Mr. Herman on July 6, August 2, and October 12 of 2017.

In support of its June 20, 2016 order, the trial court found as follows: "[Mother] had a psychological evaluation with a parenting component with Scott Herman. Mr. Herman was unable to make any recommendations based on the evaluation. The parties agreed for [Mother] to have another evaluation." The trial court accordingly ordered that Mother have another "evaluation" with Mr. Herman and that DCS pay for said assessment. Mother presented no evidence to demonstrate that she had completed the second assessment or followed through with either the psychological evaluation or any recommendations therefrom. Additionally, in its termination judgment, the trial court additionally found that Mother had not "successfully completed a mental health assessment" and had not attended appointments with the psychological examiner.

According to Ms. Wolfe, Mother never provided proof that she had participated in or completed individual counseling or domestic violence counseling. Mother related that she did complete domestic violence classes but that a subsequent domestic incident occurred between her and her paramour, forcing her to pursue a "redo." Mother presented no documentation or other evidence to corroborate her testimony that she had participated in domestic violence classes.

The trial court found that Mother had not completed the recommended drug and alcohol treatment. Mother testified that she had completed an alcohol and drug assessment the month before trial, from which she had received a recommendation that she attend inpatient treatment. Mother, however, did not attend inpatient treatment at that time. She stated that Bradford, where she had been evaluated, did not have an immediate opening and that she needed to pack her belongings. She acknowledged that Buffalo Valley had an opening for inpatient treatment the following day. Regarding Buffalo Valley, Mother further testified as follows: "[T]here was [a treatment facility] that I could have went to the next day, but I didn't have, like, a place to go to, and I would have just been, I didn't even have a ride down there." Mother acknowledged that she did not request transportation to that facility from Ms. Wolfe. Mother testified that because she was clean and sober at the time of trial, she planned to return to the service provider, hoping that the provider would now recommend outpatient treatment so she "could just do the classes."

As another requirement of Mother's permanency plan, Mother was to refrain from any illegal drug use. However, Mother admitted using methamphetamine and marijuana

approximately two weeks prior to the trial. Although Mother stated that she had been sober for approximately eight days, she admitted to using methamphetamine and marijuana regularly throughout the time the Child was in DCS custody.

According to Ms. Wolfe, Mother had been living in two other states and had not maintained contact with DCS. In its February 2016 order, the trial court stated that Mother had provided a lease for housing. The evidence demonstrated that Mother had relocated residences after that date, residing in Tennessee, Arkansas, and Kentucky. The record does not reflect whether Mother provided evidence of subsequent leases or how long Mother had remained in her current home.

Concerning the requirement to pay child support, the trial court found that Mother had not been paying her obligation. The evidence demonstrated that Mother had been incarcerated due to her failure to pay child support. According to Mother, she had a court hearing scheduled regarding child support on the day of trial and was planning to pay toward her arrearage.

Ms. Wolfe testified that Mother had not provided proof to her of anything Mother had completed with respect to the permanency plans. Upon a thorough review of the record, we determine that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that Mother had failed to substantially comply with the reasonable requirements in her permanency plans.

## C. Persistence of Conditions

Mother further contends that the trial court erred by determining that the conditions leading to the removal of the Child from her custody persisted. Regarding this statutory ground, the version of Tennessee Code Annotated § 36-1-113(g)(3) (2017) in effect at the time this action was commenced provided:[11]

---

[11] Effective July 1, 2018, subsequent to the commencement of the instant action, the General Assembly has amended Tennessee Code Annotated § 36-1-113(g)(3), replacing the former language in its entirety with the following:

> (3)(A)  The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i)  The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

- 20 -

(3)     The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

    (A)     The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

    (B)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

    (C)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

A prior court order adjudicating the child to be dependent, neglected, or abused is an essential requirement of a court's termination of parental rights upon the ground of persistence of conditions. *See In re Audrey S.*, 182 S.W.3d at 874. As this Court explained, the statutory ground of persistence of conditions "applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *See id.*

In the case at bar, the Child was removed from Mother's custody in April 2015. The trial court subsequently entered an order in September 2015, finding the Child to be dependent and neglected due to Mother's lack of housing for the Child, her inability to

---

    (ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

    (iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard.

2018 Tenn. Pub. Acts, Ch. 875, § 10 (H.B. 1856). This amendment is not applicable to the instant action.

support or care for the Child, and the Child's positive test on a drug screen for methamphetamine. Regarding the statutory ground of persistence of conditions, the trial court based its determination on Mother's failure to maintain stable housing, incarcerations, failure to pay child support, failure to complete the recommended alcohol and drug treatment, failure to remedy her domestic violence situation, ongoing drug use, past relapses, and failure to "successfully complete" a mental health assessment or attend appointments.

By reason of these circumstances, the trial court found by clear and convincing evidence that Mother had not remedied the conditions that led to the Child's removal from her custody and that other conditions persisted that would, in all probability, cause the Child to be subjected to further abuse and neglect. The trial court also found that there was little likelihood that Mother would remedy these conditions at an early date so that the Child could be returned to Mother's custody and that continuation of the legal parent-child relationship would greatly diminish the Child's chances of early integration into a stable and permanent home.

Although Mother had experienced a short period of sobriety prior to the termination trial, the Child had been in DCS custody for nearly three years. Mother admitted to using methamphetamine throughout that time and acknowledged illegal drug use of methamphetamine and marijuana as recently as two weeks prior to trial. As previously determined, Mother had also not substantially complied with the reasonable requirements of her permanency plans. Upon a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that the conditions leading to removal still persisted, that other conditions persisted that would in all probability cause the Child to be subjected to further abuse and neglect, that it was unlikely that the conditions would be remedied in the near future, and that continuation of the parent/child relationship would diminish the Child's chances of early integration into a stable and permanent home. We therefore affirm this statutory ground for termination of Mother's parental rights.

## D. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility of the Child

Mother asserts that DCS failed to present clear and convincing evidence to support termination of her parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14) (2017). This subsection, which was added to the statutory framework effective July 1, 2016, *see* 2016 Tenn. Pub. Acts, Ch. 919 § 20 (S.B. 1393), provides as an additional ground for termination:[12]

_____

[12] Effective July 1, 2018, Tennessee Code Annotated § 36-1-113(g)(14) has been amended to substitute the phrase, "A parent," in place of "A legal parent." *See* 2018 Tenn. Pub. Acts, Ch. 875, § 12 (H.B.

A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Upon our careful review of the record, we determine that the trial court did not err in finding that clear and convincing evidence existed to support this statutory ground for termination of Mother's parental rights.

This Court has recently explained the following with regard to this ground for termination of parental rights:

Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in [the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

* * *

We have made the following observations about what constitutes "substantial harm":

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

---

1856). This amendment is not applicable to the instant action.

- 23 -

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7-8 (Tenn. Ct. App. Apr. 4, 2018) (additional internal citations omitted).

This Court has held that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child. *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018); *but see In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (reversing this ground for termination when parents were unable but willing to assume custody and financial responsibility of their children). Regarding willingness, a parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the Child. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018); *In re Amynn K.*, 2018 WL 3058280, at *15.

Regarding the first prong in the instant action, the trial court found that DCS had proven by clear and convincing evidence that Mother had not manifested an ability and willingness to personally assume legal and physical custody of the Child or financial responsibility for the Child. Although Mother had testified that she was recently sober, she admitted to using methamphetamine and marijuana throughout the case and as recently as two weeks before trial. Following an alcohol and drug assessment, the service provider recommended that Mother complete inpatient treatment, which Mother had failed to do. Although Mother participated in a mental health assessment, the provider opined that Mother was not being truthful. Accordingly, the parties agreed and the trial court ordered that Mother complete a second assessment at DCS's expense. Mother did not complete the second assessment. Additionally, Mother had not been paying child support for the Child. Based on the foregoing, we agree with the trial court's determination by clear and convincing evidence that Mother was not able or willing to assume physical or legal custody of or financial responsibility for the Child.

The second prong of this statutory ground requires DCS to prove by clear and convincing evidence that placing the Child in Mother's legal and physical custody would pose a risk of substantial harm to the Child's physical and psychological welfare. In addition to Mother's illegal drug use, Mother had not maintained consistent contact with the Child, and, according to Ms. Wolfe, Mother did not have a relationship with the Child. Furthermore, the Child had been residing with the same foster parents since he entered DCS custody in April 2015. The Child had bonded with the foster parents, who wished to adopt him. By the time of trial, Mother had gone several months without

visiting the Child. The trial court consequently found that the Child was "not sure who [Mother was] anymore."

Based on the foregoing, the trial court found that DCS had met its burden regarding this prong. Upon careful review of the record, we agree. The evidence does not preponderate against the trial court's finding that placing the Child into Mother's custody would pose a risk of substantial harm to the Child's physical and psychological welfare. Accordingly, we affirm the trial court's determination by clear and convincing evidence regarding this statutory ground for termination of Mother's parental rights.

## V. Best Interest of the Child

Mother contends that the trial court erred by finding that termination of Mother's parental rights was in the best interest of the Child. We disagree. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'" (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (2017) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at

523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

On appeal, Mother argues that the trial court focused "too weighty on the wrong factors" in making its decision to terminate Mother's parental rights. According to Mother, the trial court assigned too much emphasis on its findings that Mother had failed

to visit the Child, that Mother had no meaningful relationship with the Child, and that a change in caretakers would have a negative effect on the Child. Mother further argues that although "[t]hese circumstances may have existed," the trial court "fail[ed] to account for the fact that it could refuse to terminate Mother's rights but not return custody to Mother at the same time."

We emphasize that a trial court's determination of the relevancy and weight that it provides to each statutory factor in Tennessee Code Annotated § 36-1-113(g) and other factors it deems relevant can vary on a case-by-case basis. *See In re Audrey S.*, 182 S.W.3d at 878. The factors specifically enumerated in the statute require, *inter alia*, that the trial court consider whether the parent has maintained consistent visitation with the child (factor three), whether a meaningful relationship has been established between the parent and the child (factor four), and the effect that a change of caretakers would have on the child's emotional, psychological, and medical condition (factor five). *See* Tenn. Code Ann. § 36-1-113(i). Here, the trial court recognized the Child's bond with the foster parents and their desire to adopt him, as well as Mother's lack of a relationship with the Child due to her failure to visit him. The trial court considered those factors and determined that they weighed in favor of terminating Mother's parental rights.

In its final judgment, the trial court also recognized the Child's need for permanency and stability through its determination that the Child's interest would be best served by being released from foster care. Although the Child's need for permanency or to be released from foster care are not specifically identified as statutory factors, the trial court was not limited to only the enumerated factors when determining if termination of Mother's parental rights is in the best interest of the Child. *See* Tenn. Code Ann. § 36-1-113(i). Mother further contends that the trial court did not consider its option to not terminate her parental rights but also not return custody to her. However, the trial court ostensibly considered that option when articulating its finding regarding the Child's need to be released from foster care, finding that it weighed in favor of terminating Mother's parental rights.

In its best interest analysis, the trial court also considered, as relevant to factor one, that Mother had failed to make an adjustment in her circumstances, conduct, or conditions that would make it safe and in the Child's best interest to be in the home of Mother. *See id.* The trial court specifically found that Mother had made no change or adjustment of her circumstances "at all from day one until the day of this hearing." Moreover, Mother had not substantially complied with the requirements of her permanency plan. Mother continued to use illegal drugs throughout the case and had failed to complete drug treatment. The trial court weighted this factor in favor of terminating Mother's parental rights as well.

As relevant to factor two, the trial court found that Mother failed to effect a lasting adjustment to her circumstances after being provided with reasonable efforts by DCS to assist her for such duration of time that a lasting change did not reasonably appear possible. *See id.* We now address Mother's previous argument that the trial court erred by finding that DCS had exerted reasonable efforts to assist her in regaining custody of the Child. This argument is relevant with reference to factor two in the best interest analysis. *See id.* at (2) ("Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible[.]"); *In re Kaliyah S.*, 455 S.W.3d at 555. The trial court expressly found that DCS had exerted reasonable efforts to assist Mother throughout the case. Considering the record, we agree.

In its final judgment, the trial court found that DCS "made services available to [Mother], but she did not take advantage of them." In support, Ms. Wolfe testified that DCS had made reasonable efforts to assist Mother with visitation and with the requirements of her permanency plans. Specifically, Ms. Wolfe stated that she had provided Mother with her contact information and her supervisor's contact information, conducted drug screening, and provided Mother with transportation. Ms. Wolfe also testified that she had assisted Mother with setting up and scheduling in-home services, an alcohol and drug assessment, and a mental health assessment. According to Ms. Wolfe, she had scheduled several appointments for Mother that Mother failed to attend. Ms. Wolfe also described an occasion when she transported Mother around the area in an effort to help Mother seek employment.

According to Ms. Wolfe, she attempted to locate Mother when Mother was not in contact with DCS. Because Mother had reached eighteen while in foster care, Ms. Wolfe had assisted her with extension of foster care services. Although Mother had enrolled in an extension of foster care services for a period of time, she ultimately decided that it was not in her best interest and that she should seek employment. According to Ms. Wolfe, she had continued to invite Mother to child and family team meetings and meetings to develop the permanency plans. Mother acknowledged that Ms. Wolfe had attempted to assist her and appeared genuinely concerned about Mother's health and welfare. Upon complete review, we determine that the evidence preponderates in favor of the trial court's finding that DCS had provided reasonable efforts to assist Mother.

Upon its determination that DCS had made reasonable efforts to assist Mother but that Mother had failed to take advantage of the services offered, the trial court further found in relation to factor two that Mother was "no closer to effecting a lasting adjustment than she was in 2015." The trial court thereby weighed this factor in favor of terminating Mother's parental rights. *See* Tenn. Code Ann. § 36-1-113(i). The trial court did not expressly weigh factor six, specifically whether Mother or an individual residing with her had "shown brutality, physical, sexual, emotional or psychological abuse, or

neglect toward the child," either in favor of or against termination. *See id.* However, the trial court did note in another section of its order that Mother had failed to address domestic violence concerns in her life.

In relation to factor seven, the trial court found that Mother's home was unhealthy and unsafe due to criminal activity and drug use in the home. *See id.* Furthermore, the court determined that Mother was consistently unable to care for the Child in a safe and stable manner due to Mother's use of alcohol and controlled substances. The trial court specifically found that Mother continued using drugs and admitted to using methamphetamine and marijuana two weeks prior to trial. For those reasons, the trial court determined that this factor weighed in favor of terminating Mother's parental rights.

As to factor eight, the trial court determined that Mother's "mental and/or emotional status" would be detrimental to the Child. *See id.* On this point, the trial court found that Mother had "mental and emotional problems and issues" that were "not by her own making." The court recognized that Mother endured a "bad situation" when she was younger. The record reflects that Mother was in foster care as a child due to her parents' own illegal drug use. The trial court found that those problems needed to be addressed by Mother but that she had failed to properly do so. The trial court therefore found that this factor weighed in favor of the termination of Mother's parental rights.

Factor nine relates to whether Mother had paid child support for the Child. *See id.* The trial court found that Mother had not been paying child support or had paid only a token amount despite the income she had received. Therefore, the trial court found that this factor weighed in favor of the termination of Mother's parental rights.

Upon a thorough review of the record in light of the statutory factors, we determine that the evidence supports the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Mother's parental rights.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's finding regarding the statutory ground of abandonment for failure to pay child support. We affirm the trial court's judgment in all other respects, including the termination of Mother's parental rights to the Child. We remand this case to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below. Costs on appeal are assessed to the appellant, Alexis F.

_____
THOMAS R. FRIERSON, II, JUDGE